IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SEAN MICHAEL LYONS-PRICE,

    Plaintiff,

v.                                                     Civil Action No. 5:11cv145
                                                         Judge Stamp

JAMES SPENCER, and
STEVEN M. CROOK,

    Defendants.

## REPORT AND RECOMMENDATION

### I. Procedural History

On October 20, 2011, plaintiff, formerly an inmate at the Northern Regional Jail ("NRJ") in Moundsville, West Virginia, initiated this case by filing a civil rights complaint under 42 U.S.C. § 1983. Plaintiff is proceeding *pro se,* was granted permission to proceed *in forma pauperis* on October 25, 2011, and paid an initial partial filing fee on October 31, 2011. On November 17, 2011, upon a preliminary review of the file, the undersigned determined that summary dismissal was not appropriate, and directed the United States Marshal Service to serve the Complaint.

On December 12, 2011, the defendants filed a Motion to Dismiss with a Memorandum of Law in support. Because the plaintiff is proceeding *pro se*, the Court issued a Roseboro[1] Notice on December 22, 2011. The plaintiff filed a response to the defendants' motion on January 11, 2012, to which the defendants replied on January 25, 2012.

This case is before the undersigned for a report and recommendation on the pending motions.

### II. Contentions of the Parties

**A. The Complaint (Dkt.# 1)**

---

[1] Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (finding that the court must inform a pro se plaintiff of his right to file material in response to a motion for summary judgment).

1

In the complaint, the plaintiff raises multiple claims alleging deliberate indifference by the defendants to his safety and wellbeing, reordered here for clarity:

1) on July 25, 2011, in retaliation for complaining to a shift supervisor about an issue, he was deliberately placed in unsafe housing. When he requested immediate removal to suicide watch for protection, his property was confiscated and not returned for a month; he never received his "federal discovery pack" back, and later learned that it was circulating within the jail, making it unsafe for him to be in the general population.

2) On September 24, 2011, after his requests for protective custody were ignored, he was moved to a pod where he where he was physically assaulted and sustained a head injury.

3) On September 25, 2011, after spending the night in medical, he was moved to protective custody, but was left locked down 23 hours a day; and

4) he sent over seven letters to defendant Crook, "detailing numerous incidents" and notifying him that if he were placed in general population he would be assaulted; "nothing was done," resulting him being placed into the pod where he was assaulted on September 24, 2011.

5) From July 18 – mid-August, 2011, he and other prisoners were housed in the pod's dayroom without beds, or access to water and toilets during lockdown hours.

6) He was denied a mat or bedding for 18 hours on August 24, 2011, forcing him to sleep on a bare concrete slab.

7) On September 24, 2011, when he was removed from lockup and placed in B6, his personal property was again lost.

8) On multiple unspecified dates, his incoming and outgoing mail was discarded by defendant James Spencer and unnamed guards.

9) His requests, grievances, commissary forms and sick call requests are removed from the pod "mailbox" by defendant James Spencer and unnamed guards, torn up and thrown away.

10) Since August 16, 2011, he has been denied basic bedding and clothing, forcing him to borrow the same from other inmates.

11) On a date between August 24 – August 27, 2011, after a verbal altercation, Officer Tim White threw his food tray at him, hitting him in the leg and spilling the food, forcing him to go without a meal.

12) Inmates are given an ultimatum to choose between meals or medical treatment.

13) Guards deliberately interfere with his ability to timely file legal documents.

14) The jail illegally collects "booking fees."

He alleges that he suffered an actual injury, when he "took many blows to the head and

had my head slammed into [a] brick wall. Went to medical and kept overnight. Still have a lump . . . and sore spots. Get dizzy and nauseous sometimes[.]"

Plaintiff avers that he has exhausted his administrative remedies by making informal verbal requests to C.O's, sending written request forms to "admin/counselors," filing grievances with "admin/counselors," and personal meetings with "admin/counselors." He alleges that "nothing was done to rectify issues."

As relief, he requests compensation for his lost property (mail, photos, commissary and legal documents); compensation for his pain and suffering from the head injury sustained in the assault; an investigation into other prisoner's claims and complaints; an investigation into why "P.C." is in 23-hour lockdown; and an admission "of guilt by those responsible for problems" at the Northern Regional Jail.

**B.  The Defendants' Motion to Dismiss and Memorandum in Support (Dkt.# 15)**

In their motion to dismiss, the defendants argue that the plaintiff's complaint should be dismissed for failure to exhaust his administrative remedies.  Further, they argue, plaintiff's claims are moot.  Defendants also assert that they are entitled to qualified immunity shielding them from personal civil liability for official acts undertaken while acting within the scope of their authority.  Finally, they argue that plaintiff has failed to state a claim upon which relief can be granted, thus his claims should be dismissed with prejudice.

**C.  The Plaintiff's Response to the Defendants' Motion to Dismiss (Dkt.# 47)**

In his response to the motion to dismiss, the plaintiff generally reiterates his claims and attempts to refute the defendants' arguments. He disputes the defendants' assertion that the food tray fell because he was not there to grab it; admits writing the October 8, 2011 letter but argues that although many issues were "seemingly addressed" at the meeting with defendant Spencer, "many more have come up since 10-08-11," and those later-arising problems have been ignored. He denies that he has had all of his property returned, pointing out that there were two incidents of missing

property and he has still not had the property missing from July 25, 2011 returned to him. He reiterates his claim that defendants were deliberately indifferent to his concerns about safe housing, when they placed him into the pod where he was assaulted. He alleges that his complaints have been ignored and that he has been retaliated against by jail personnel for filing complaints; and that jail personnel is deliberately dilatory in fulfilling inmate requests for photocopies, in order to make inmates miss court-imposed deadlines. He raises two new claims, that his incoming mail has been interfered with, specifically, two books and three letters, allegedly because of their racial content, in violation of his freedom of religion, and that the jail has denied his request to release funds from his inmate account to his fiancè.

Finally, he alleges that, despite all his many complaints, he is not just "anti-jail," describing several officers at the NRJ by name, who, he alleges, do a "great" job.

### E. The Defendants' Reply to the Plaintiff's Response (Dkt.# 23)

In their reply to the plaintiff's response, the defendants reiterate their arguments, pointing out that plaintiff's own admissions buttress their position that his claims are moot and that he has failed to exhaust his administrative remedies. Further, they assert that the plaintiff's response does not refute that they are entitled to qualified immunity and plaintiff's claims should be dismissed.

### III. Standard of Review

**Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

### IV. Analysis

**Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available

administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[1] and is required even when the relief sought is not available. Booth v. Churner, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter v. Nussle, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 126 S.Ct. 2378, 2382 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons;" (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford, 126 S.Ct. at 2387 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 2393.

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint. However, that decision does not abrogate the fact that an action under 42 U.S.C. § 1983 is subject to exhaustion of administrative remedies as required by the PLRA.

The West Virginia Regional Jail Authority makes available to its inmates a grievance procedure through which they may seek review of complaints related to the conditions of their confinement. Under this procedure, inmates must first submit a grievance to the Administrator of the facility in which they are confined. Upon receipt of the grievance, the Administrator may reject the

---

[1] Porter v. Nussle, 534 U.S. 516, 524 (2002).

grievance if it appears on its face to have been filed in bad faith, or if other administrative procedures exist that have not been utilized. If the grievance is rejected, the Administrator must advise the inmate of the rejection. If the grievance is not rejected, the Administrator may assign a staff member to investigate the complaint. Such staff is then required to submit a written report within forty-eight (48) hours. Within two days of receipt of the written report, the Administrator must provide a written decision which identifies the action taken, the reasons for the action, and the procedures that must be followed to properly appeal the decision. If the Administrator's response is unfavorable, the inmate may appeal to the Chief of Operation within five days of the receipt of the Administrator's decision. Upon receipt of an appeal, the Chief of Operations must immediately direct the Administrator to forward copies of all information relating to the inmate's grievance within two business days. The Chief of Operations may direct an investigation of the report be conducted and a written report be submitted within 15 days. Within 10 days of receiving all of the information related to the grievance, the Chief of Operations must provide a written decision which identifies the corrective action taken or the reasons for denying the grievance. If the Chief of Operations' response is unfavorable, the inmate may appeal to the Office of the Executive Director within five days of receipt of the Chief of Operations' response. To do so, the inmate must mail to the Executive Director, copies of the original complaint and all of the responses thereto. The Office of the Executive Director must respond to an inmate's appeal within 10 days of receiving all the information. Unless the inmate has been notified of an extension of time for a response, the inmate may move to the next stage of the grievance process if the inmate does not receive a response at the expiration of the time limit at any stage of the process. The grievance process must be concluded within 60 days, inclusive of any extensions.

    In his October 20, 2011 complaint, plaintiff contends that he exhausted all available remedies. However, out of the twelve administrative requests and grievances attached to his complaint, only one is actually a grievance; the others are all merely 'requests." For the one

grievance filed, dated August 22, 2011, regarding property taken on July 25, 2011 and not returned, plaintiff has provided nothing to show that he did anything beyond the initial submitting of it to the Administrator of the NRJ. Even for his most serious claims, regarding safe housing and protection from assault by other inmates, or the head injury he alleges he sustained, plaintiff has attached nothing to show that he ever even initiated the formal process of utilizing the NRJ's administrative grievance system. He does, however, allege that he sent "over 7 letters to Mr. Crook detailing numerous incidents. Nothing was done." Although he alleges that he has seen defendant James Spencer and unnamed guards "remove mail, grievances, requests, commissary forms and sick calls from the pod "mailbox" and tear them up and throw them out[,]" he does not allege that any grievance he ever personally filed was interfered with or disposed of. For the majority of the claims in his complaint, he has provided nothing to show that he ever even filed a "request," let alone a grievance.[1]

In their motion to dismiss, the defendants contend that the plaintiff did not file appropriate grievances in accordance with jail procedure, but rather, expressed his complaints by writing multiple letters to defendant Steven Crook. Defendants aver that, based on their content, those letters were forwarded to Bill Canterbury, the Program Manager of the West Virginia Regional Jail and Correctional Facility Authority, who then contacted Shar Mason, the Director of Inmate Services at NRJ about plaintiff's complaints. Defendants assert that on October 6, 2011, a meeting was then conducted between Shar Mason, defendant James Spencer,[2] a Lieutenant Simmons, and plaintiff. At

---

[1] Plaintiff attached nothing to show that he ever filed a formal grievance for his claims that: defendant Steven Crook was deliberately indifferent to his "numerous letters sent . . . detailing many many incidents at NRJ;" he was housed on dayroom floor from July 18 → mid-August 2011 with no beds or access to water and toilets during lockdown hours; he was denied a mat or bedding for 18 hours on August 24, 2011; on September 24, 2011, his property was lost or thrown away; defendant James Spencer and "numerous guards" discarded or destroyed incoming and outgoing inmate mail, grievances, commissary forms and sick call requests from the pod "mailbox;" he was denied basic bedding and clothing since August 16, 2011; in late August, 2011, a guard threw a tray of food at him, forcing him to miss a meal; defendants forced him and other inmates to choose between meals or medical treatment; he was denied the ability to timely file his complaint; and defendants illegally collect booking fees from inmates who are processed at the jail.

[2] Defendant James Spencer is the Administrator of the Northern Regional Jail.

8

this meeting, each of plaintiff's July 25 → September 25, 2011 complaints and grievances were addressed, apparently to plaintiff's satisfaction, because two days after the meeting, on October 8, 2011, plaintiff wrote a letter to defendant Crook, so stating. As such, defendants contend that not only did plaintiff fail to exhaust his administrative remedies, the claims in his complaint are moot, having all been resolved to his satisfaction several weeks before he filed his complaint. Attached to the defendants' motion is a copy of an October 5, 2011 email from Bill Canterbury to defendant James Spencer and Shar Mason, requesting their assistance in helping him answer plaintiff's attached letter; an October 7, 2011 email from Shar Mason to Bill Canterbury and defendant James Spencer, addressing the specifics of the meeting and plaintiff's complaints; and an October 7, 2011 letter from Bill Canterbury to plaintiff, referencing an October 3, 2011 letter that plaintiff apparently wrote to the West Virginia Regional Jail Authority's Central Office regarding his complaints at the NRJ. Finally, the defendants attach an October 8, 2011 letter from plaintiff stating:

> Mr. Crook,
> Im [sic] sorry to bother you again, but you needed to be notified that I had a personal meeting with James Spencer, Shar Mason, and Lieutenant Simmons regarding a letter I sent to you recently.
> Please be aware that as of today, they have rectified my situation(s) and I am satisfied with their decisions.
> Please accept my apology for writing you so much and let the 3 people mentioned above know I thank them and let them know I sent you this so they can see I am satisfied.
> Thank you, Sean Price.

(Dkt.# 15-4 at 1).

In his January 11, 2012 response to the defendants' motion, the plaintiff disputes some points made by Shar Mason regarding the food tray that was thrown at him, and asserts that even though he admits in his October 8, 2011 letter that "many issues were seemingly addressed," many more have come up since October 8, 2011. He now alleges that he attempted to exhaust his administrative remedies, but that the jail administrator ignored his grievances, so he then wrote to Charleston. He admits he was "replied to then ignored again." (Dkt.# 21 at 2). Consequently, the plaintiff asserts,

9

he attempted to exhaust his administrative remedies and his complaint should not be dismissed. He attaches copies of three new requests and two new grievances, for dates ranging between December 20, 2011 and January 5, 2012, twenty-two to six days prior to the date he filed his response to the defendants' motion to dismiss. However, as the defendants' reply correctly notes, plaintiff's admission that the earlier claims have been resolved indicates plaintiff's concession that they are now moot, and the new claims raised must also fail because plaintiff has not exhausted them administratively.

Accordingly, assuming for purposes of this motion that the plaintiff did initiate the grievance procedure with regard to a few of the issues raised in his complaint, it is undisputed that the plaintiff never filed any grievance request or appeal to either the Chief of Operation or the Executive Director, the final steps in the exhaustion process. Moreover, in his response, plaintiff implicitly admits that the claims he raised in his complaint were already moot when he filed the complaint. Thus, since the plaintiff has not availed himself of the entire administrative remedy process, or in the alternative, has never properly completed the administrative remedy process with regard to any issue, the plaintiff's claims in the complaint are all either moot and/or unexhausted, and he has failed to exhaust his administrative remedies for his later claims, raised for the first time in his response to the defendants' motion.

Moreover, to the extent that the plaintiff asserts that the Administrator ignored or did not reply to his grievances, such failure on the part of the Jail Administrator does not exempt the plaintiff from the exhaustion requirements. Even when no response is forthcoming, the Regional Jail's exhaustion procedures contemplate moving to the next level. It is clear that the plaintiff simply gave up when he did not receive a response to his requests. This, however, is not sufficient to complete exhaustion.[3]

---

[3] Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements . . . ," see Booth v. Churner, 532 U.S. at 741, n. 6, several courts have found that the mandatory

## V. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion to Dismiss (Dkt.#15) and the *pro se* plaintiff's complaint (Dkt.# 1) be **DENIED** and **DISMISSED with prejudice** from the docket.

**Within fourteen (14) days** after being served with a copy of this recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated: February 6, 2012.

    /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE

---

exhaustion requirement may be excused in certain limited circumstances. See Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Ziemba v. Wezner, 366 F.3d 161 (2d Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, 2006 WL 2945967 (S.D.Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where Plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms). To the extent, therefore, that exhaustion may be waived, the plaintiff has failed to set forth any accepted reason to excuse his failure to exhaust.